**UNITED STATES of America, Plaintiff,**

v.

**1328 NORTH MAIN STREET, DAYTON, OHIO, 45405, Defendant.**

**No. MS–3–84–60.**

United States District Court, S.D. Ohio, W.D.

June 3, 1988.

---

D. Michael Crites, U.S. Atty., Robert Behlen, Asst. U.S. Atty., Cincinnati, Ohio, for plaintiff.

Konrad Kuczak, Dayton, Ohio, for defendant.

DECISION AND ENTRY OVERRULING THE AMENDED MOTION TO RETURN PROPERTY OF THOMAS H. McCARTHY, AS IT RELATES TO THE RETURN OF PROPERTY SEIZED BY PLAINTIFF ON SEPTEMBER 7, 1984 (DOC. # 48)

RICE, District Judge.

This case is before the Court on the Amended Motion of Thomas H. McCarthy,

D.O., for the return of property (Doc. # 48). This matter was originally before the Court on Dr. McCarthy's Motion to Quash Search Warrant and Application for Protective Order and Motion for Return (Doc. # 1), which this Court previously determined must be treated as a Fed.R. Crim.P. 41(e) Motion to Return (Doc. # 25, at 4–6). For the reasons set forth below, Dr. McCarthy's motion is overruled in its entirety.

At 9:45 a.m. on September 7, 1984, agents of the Federal Drug Enforcement Agency (DEA) obtained from United States Magistrate Steinberg a warrant to search the premises at 1328 North Main Street in Dayton, Ohio, described as the offices and related facilities of Dr. McCarthy. DEA agents, accompanied by state and local authorities, executed the warrant between 11 a.m. and 3:45 p.m. on September 7, 1984. At 1:46 p.m. on September 7, 1984, Dr. McCarthy filed a motion styled "Motion to Quash Search Warrant, Application for Protective Order and Motion for Return." (Doc. # 1).

Hearings were held before Magistrate Steinberg on September 10 and September 11, 1984. Treating Dr. McCarthy's motion as a Motion for Return of Property pursuant to Fed.R.Crim.P. 41(e), Magistrate Steinberg stated on the record that the warrant which he had issued was supported by probable cause (Doc. # 21, Transcript of Proceedings, September 11, 1984, Honorable Robert A. Steinberg, Magistrate, presiding, at 50). On September 11, 1984, Magistrate Steinberg ordered the United States to deliver to Dr. McCarthy by September 14, 1984, copies of all the documents seized pursuant to the September 7 search. Upon an amendment by Magistrate Steinberg of said Order, the United States returned to Dr. McCarthy on September 13 and September 17 both certain original documents seized from his office and copies of the remainder of the documents which had been seized.

On December 11, 1984, Dr. McCarthy filed a motion requesting that Magistrate

Merz, who had taken over the case from Magistrate Steinberg, hold a hearing on disputed issues of fact and a conference to set the ground rules for final resolution of his motion. Magistrate Merz declined to hold a hearing on Dr. McCarthy's motion. In a Report and Recommendation issued on August 6, 1985, Magistrate Merz adopted Magistrate Steinberg's finding, on the record, of probable cause and recommended that Dr. McCarthy's Motion to Quash Search Warrant and Motion for Return of Property be denied. The Magistrate also recommended denial of Dr. McCarthy's claim for damages for losses sustained due to seizure of his records. On August 16, 1985, Dr. McCarthy filed an objection to the Report and Recommendation of Magistrate Merz (Doc. # 19). In a Decision and Entry filed on April 2, 1986, 634 F.Supp. 1069, this Court rejected the Report and Recommendations of Magistrate Merz (Doc. # 25). In said Decision and Entry, the Court determined that the decision of Magistrate Steinberg to treat Dr. McCarthy's motion as a Rule 41(e) motion to return was correct (Doc. # 25, at 4). Further, the Court concluded that the warrant obtained by the DEA from Magistrate Steinberg was *not* a general warrant (Doc. # 25, at 8). However, the Court determined that an evidentiary hearing was necessary with regard to the following issues:

(1) Whether there were intentional or reckless omissions (or falsehoods) in the affidavit, such as whether Dr. McCarthy was absent from his premises at certain times, and, if so, whether the affidavit's remaining content was sufficient to establish probable cause;

(2) Whether there was probable cause to support a search of the breadth authorized by the warrant;

(3) Whether the officers executing the warrant seized items from Dr. McCarthy's premises which were outside the scope of the warrant;

(4) Whether the officers executing the warrant acted so improperly that their conduct was constitutionally unreasonable; and

(5) Whether Dr. McCarthy is entitled to damages for the Government's failure to comply with this Court's Order to promptly return his documents.

The oral hearing on Dr. McCarthy's Motion to Return Property was held on September 25, September 26, November 10, November 12, and November 14, 1986.

## I. DISCUSSION

Before discussing the specific issues currently before the Court, the Court finds it necessary to make the following general observations regarding Dr. McCarthy's Amended Motion to Return Property.

*First,* it must be noted that the standard upon which the validity of the DEA's search warrant is to be judged is a probable cause standard. "It is well settled that an affidavit supporting a search warrant need *not* establish beyond a reasonable doubt that incriminating evidence will be found at the place to be searched." *United States v. Savoca,* 739 F.2d 220, 224 (6th Cir.1984) (emphasis added), *reh'g granted,* 761 F.2d 292 (6th Cir.), *cert. denied,* 474 U.S. 852, 106 S.Ct. 153, 88 L.Ed.2d 126 (1985). In other words, it is not the role of the affiant to prove guilt beyond a reasonable doubt or to an absolute certainty. In *Illinois v. Gates,* 462 U.S. 213, 235, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527 (1983), *reh'g denied,* 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983), the Supreme Court explained what is meant by the term "probable cause".

As early as *Locke v. United States,* [11 U.S. 339] 7 Cranch 339, 348 [3 L.Ed. 364] (1813), Chief Justice Marshall observed ... "[T]he term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation.... It imports a seizure made under circumstances which warrant suspicion." More recently, we said that "the *quanta* ... of proof" appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant. Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision. While an effort to fix some general, numerically precise degree

of certainty corresponding to "probable cause" may not be helpful, it is clear that "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause."

(*Id.*) (citations omitted). Thus, in the case at bar, the affidavit submitted in support of the warrant of September 7, 1984, need only establish that there is "a fair probability" that on September 7, 1984, the premises at 1328 North Main Street would contain "contraband or evidence of" violations of 21 U.S.C. §§ 841(a)(1) and 846. *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332.

*Second,* it is important to note that this is not a case in which the DEA is seeking to establish that a "pusher" is peddling controlled substances on the streets. Rather, in the case at bar, the DEA is seeking to establish that someone (i.e. Dr. McCarthy), who is licensed to distribute controlled substances and/or prescriptions for controlled substances, is abusing his authority and in so doing is violating the law. "While physicians are exempt from the provisions of the drug abuse statutes when they dispense or prescribe controlled substances in good faith to patients in the regular course of professional practice, they are liable for prosecution under Sec. 841, 21 U.S.C. ' * * * when their activities fall outside the usual course of professional practice.'" *United States v. Kirk,* 584 F.2d 773, 784 (6th Cir.1978) (*quoting U.S. v. Moore,* 423 U.S. 122, 124, 96 S.Ct. 335, 337, 46 L.Ed.2d 333 (1975)), *cert. denied,* 439 U.S. 1048, 99 S.Ct. 726, 58 L.Ed.2d 708 (1978), *reh'g denied,* 440 U.S. 931, 99 S.Ct. 1270, 59 L.Ed.2d 488 (1979). Dr. McCarthy's alleged violation is evidenced by his alleged failure to examine (or *properly* examine) persons/patients to whom controlled substances were dispensed and/or for whom controlled substances were prescribed.

## A. *The Problem of Omissions*

As previously noted, the *first* issue before the Court is whether there were any

intentional or reckless omissions (or falsehoods) in the affidavit underlying the search warrant issued September 7, 1984, for 1328 North Main Street, Dayton, Ohio 45405. In his Memorandum in Support of Motion to Return Property, Dr. McCarthy asserts that the affiant, DEA Agent Kopp, concealed twenty-six (26) separate facts from the Magistrate with the intention of "depriv[ing] the Magistrate of his opportunity to exercise meaningful supervision over the search." (Doc. # 43, at 10).

In *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978), the United States Supreme Court held:

[W]here the defendant makes a substantial preliminary showing that a false statement *knowingly* and *intentionally,* or with *reckless disregard* for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a *preponderance of the evidence,* and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

(emphasis added). This Court has already determined that Dr. McCarthy made a sufficiently substantial preliminary showing to require an evidentiary hearing on the issue of probable cause (Doc. # 25, at 7), and has in fact held such a hearing. The question which remains is whether Dr. McCarthy has shown by a preponderance of the evidence that the affiant's omissions, if any, were the result of bad faith[1] or reckless disregard, and, if so, whether after said omissions are set aside, the affidavit's re-

---

**1.** When this Court uses the term "bad faith", it refers to omissions or false statements which were knowingly and intentionally made.

maining content is sufficient to support probable cause.

While the *Franks* holding itself dealt only with the problem of false statements within an affidavit, the holding "has [since] been extended to situations in which *material* omissions affect the probable cause determination." *United States v. Bailey,* 831 F.2d 297 (6th Cir.1987) (table) (text available in WESTLAW) (emphasis added). *See also United States v. Stanert,* 762 F.2d 775, 780–82 (9th Cir.), *op. amended,* 769 F.2d 1410 (9th Cir.1985). It is important to note that not every omission is sufficient to void a search warrant. "Under *Franks,* a proven misstatement can vitiate an affidavit only if it is established that the misstatement was the product 'of deliberate falsehood or of reckless disregard for the truth.... Allegations of negligence or innocent mistake are insufficient.' [*Franks v. Delaware,*] 98 S.Ct. at 2685. By analogy, it must be proven that the omissions were made intentionally or with a reckless disregard for the accuracy of the affidavit; negligent omissions will not undermine the affidavit." *United States v. Martin,* 615 F.2d 318, 329 (5th Cir.1980). Thus, in the case at bar, the burden is upon Dr. McCarthy to establish by a preponderance of the evidence that the affiant recklessly or in bad faith (i.e. knowingly and intentionally) omitted a material fact or facts from the affidavit which was filed in support of the warrant.

■ Dr. McCarthy asserts that the affiant's testimony that he wanted certain evidence within the affidavit to convince the Magistrate that Dr. McCarthy and his wife, Mary McCarthy, were, in fact, drug pushers, indicates that any omissions were intentional (i.e. made in bad faith). (Doc. # 43, at 10). The Court concludes that the fact that the affiant hoped that certain evidence would convince the Magistrate that illegal activities were taking place at the 1328 North Main Street address in no way indicates that the affiant recklessly or in bad faith omitted facts in the hope of misleading the Magistrate. Every affiant hopes that the evidence that he or she sets forth will convince the Magistrate that there is probable cause to believe that evidence of a crime can be found at a particular location. An affiant seeks a warrant because he or she believes probable cause does exist. The fact that an affiant wishes to obtain a warrant does not prove that said affiant is willing to mislead the Magistrate in order to obtain such warrant.

■ While an affiant's state of mind (i.e. culpability) may be difficult to establish, "[i]t is possible that when the facts omitted from the affidavit are *clearly critical* to a finding of probable cause, the fact of recklessness may be inferred from proof of the omission itself." *Martin,* 615 F.2d at 329 (emphasis added). Similarly, this Court concludes that in certain extreme situations bad faith may be inferred from proof of the omission of facts which are *clearly critical.* Thus, it is incumbent upon the Court to examine each of the alleged omissions individually in order to determine whether that particular omission is *clearly critical* to the finding of probable cause.

### 1. *Alleged Omission #1*

Dr. McCarthy first asserts that the affiant recklessly or in bad faith omitted the fact that:

Gail Hamm, the government's confidential informant, was a convicted felon whose release from prison the government had obtained so that the government could use and control the informant in undercover investigations. (Transcript [of proceedings, before the Honorable Walter H. Rice, Judge, ((hereinafter referred to as Transcript)) ], p. 179, lines 3–16). With respect to the informant, the affiant further failed to advise the Magistrate that Dr. McCarthy had made a professional diagnosis of the informant's health and had concluded that the informant had an anxiety problem that was the result of a pregnancy, (Transcript, p. 180, lines 13–16), that the medical records of the informant could have been obtained upon request (Transcript, p. 180, lines 17–23), and that the affiant made no attempt to obtain the medical records of the informant or have an independent medical examination of the infor-

mant conducted (Transcript, page 180, lines 2–5, and page 180, line 24–page 181, line 1).

(Doc. # 43, at 6). This Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 1 is clearly critical, and thus, bad faith or recklessness cannot be inferred from said omission.

■ The fact that the confidential informant (or cooperating individual) is a convicted felon does affect her trustworthiness. However, the affiant did indicate that the confidential informant is reliable and that she has provided the DEA with accurate information on at least twenty (20) occasions (Affidavit of Gerald R. Kopp, September 7, 1984, ((hereinafter Kopp Affidavit)), at 3–4). Affiant further indicated that the confidential informant has provided information to local police departments which has resulted in at least fifteen (15) arrests (Kopp Affidavit, at 4). The confidential informant's reliability with regard to other cases is sufficient to overcome any inference of untrustworthiness which could be drawn from the fact that the confidential informant is a convicted felon.

■ In addition, the Court concludes that the affiant's failure to advise the Magistrate of Dr. McCarthy's diagnosis is irrelevant to the finding of probable cause, and, thus, not clearly critical. The confidential informant indicated that prescriptions had been issued by Dr. McCarthy and Mary McCarthy without any physical examination or after only a cursory examination (Kopp Affidavit, at 4, 49–50). Further, the confidential informant indicated that she told Dr. McCarthy and Mary McCarthy that she traded, sold, or abused the substances which Dr. McCarthy and/or Mary McCarthy prescribed (Kopp Affidavit, at 6). The key fact which the affiant is attempting to establish is *not* necessarily that Dr. McCarthy failed to provide a diagnosis, but, rather, that he failed to properly *examine* his patients before prescribing controlled substances. Even if a person is legitimately ill, a doctor's office or pharmacy is not a candy store at which controlled substances may be obtained (through pur-

chase or prescription) at will. The failure to provide a proper physical examination can be evidence that controlled substances are not being prescribed for legitimate ethical, medical uses.

■ Finally, the Court concludes that the affiant's failure to inform the Magistrate that the medical records of the informant could have been obtained upon request and/or that affiant made no attempt to obtain the medical records of the informant or have an independent medical examination of the informant conducted is also irrelevant. Once again, it is important to remember that it is Dr. McCarthy's alleged failure to examine which is important, not the state of his patients' health.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 1 is clearly critical, and thus, the Court cannot conclude that said omission was made recklessly or in bad faith.

### 2. *Alleged Omission # 2*

■ Dr. McCarthy next asserts that the affiant recklessly or in bad faith failed to inform the Magistrate of the fact that "[a]ny and all drugs which Dr. McCarthy had prescribed had legitimate, ethical, medical uses. (Transcript, p. 183, lines 9–11)." (Doc. # 43, at 6). The Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 2 is clearly critical, and thus, bad faith or recklessness on the part of the affiant cannot be inferred from said omission.

The affiant did not say that the drugs prescribed lacked legitimate medical, ethical uses, nor did he imply that such is the case. There is nothing in the affidavit which would indicate to the Magistrate that Dr. McCarthy was prescribing and/or selling "street" drugs. The affiant could reasonably have assumed that the Magistrate would believe that the controlled substances to which the affidavit referred had legitimate, medical, ethical uses.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omis-

sion #2 is clearly critical, and thus, the Court cannot conclude that said omission was made recklessly or in bad faith.

### 3. *Alleged Omission #3*

■ Dr. McCarthy next asserts that the affiant recklessly or in bad faith failed to inform the Magistrate of the fact that "[t]he affiant made no attempt to inquire of the other individuals, who the informant had identified as being recipients of prescriptions for non-therapeutic purposes, as to the state of their health (Transcript, p. 182, line 18 through page 183, line 4)." (Doc. #43, at 6). The Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission #3 is clearly critical, and thus, bad faith or recklessness on the part of the affiant cannot be inferred from said omission.

It is important to note that the affiant did not mislead the Magistrate as to the state of the health of the "other individuals". Nowhere in the affidavit does the affiant indicate that he had inquired of their health. Further, it is quite probable that such an inquiry would have been futile. If a person is obtaining prescriptions for non-medical purposes, that person is hardly likely to inform an agent of the DEA that he or she is in perfect health.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission #3 is clearly critical to the Magistrate's finding of probable cause, and thus, the Court cannot conclude that said omission was made recklessly or in bad faith.

### 4. *Alleged Omission #4*

■ Dr. McCarthy next asserts that the affiant acted recklessly or in bad faith in failing to apprise the Magistrate of the fact that "[t]he affiant could have obtained the medical records of John Hamm, one of the four other individuals identified by the informant, by requesting same (Transcript, p. 182, lines 1–5)." (Doc. #43, at 6). The Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission #4 is clearly critical, and thus it cannot be inferred that affiant acted recklessly or in bad faith with regard to said omission.

As previously discussed, it is not the role of the affiant to prove guilt beyond a reasonable doubt or to an absolute certainty. Dr. McCarthy would require more of the affiant in the way of proof than the law requires. The affiant in no way misled the Magistrate. He never stated that he could not have obtained Mr. Hamm's medical records, nor did he state that he had obtained Mr. Hamm's medical records. The key allegation with regard to Mr. Hamm is the fact that he was given controlled substances without a physical examination. The DEA was simply not required to complete its investigation prior to seeking a search warrant.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission #4 is clearly critical, and thus, the Court cannot conclude that said omission was made recklessly or in bad faith.

### 5. *Alleged Omission #5*

■ Dr. McCarthy further asserts that the affiant recklessly or in bad faith omitted the fact that "[t]he affiant had knowledge that the only individual who received a prescription for Dilaudid, without physically presenting himself in Dr. McCarthy's office (see pages 33 and 34 of the Affidavit), was suffering from terminal cancer (Transcript, p. 184, lines 6–18) and has since expired." The Court concludes that Dr. McCarthy *has* met his burden of establishing that Alleged Omission #5 *is* clearly critical, and thus, the Court may infer that said omission *was recklessly* made.

The testimony of the affiant, Gerald Kopp, at the evidentiary hearing held by this Court indicates that the testimony at pp. 33 and 34 of Mr. Kopp's affidavit concerned Mr. Gaskey, the confidential informant's uncle. The crux of the testimony presented at pp. 33 and 34 of the affidavit is that the confidential informant was able to obtain a prescription for sixty (60) Dilaudid for a sick relative without bringing said relative in for a physical examination. Although the affiant was aware that Mr. Gaskey was suffering from cancer, he failed to inform the Magistrate of this fact

(Transcript, at 184). Dr. McCarthy testified that Mr. Gaskey had previously been diagnosed as being terminally ill and that the only reason why the confidential informant was given Mr. Gaskey's medication was that Mr. Gaskey himself was too ill to visit Dr. McCarthy's office (Transcript, at 322).

As previously noted, affiant's key allegation in this case is that Dr. McCarthy was dispensing and/or prescribing controlled substances without conducting a proper physical examination. With regard to the vast majority of patients, under such a theory or allegation, diagnosis is not material to the finding of probable cause. As a general rule, regardless of a patient's diagnosis, the prescription of controlled substances without a proper physical examination indicates that there may well be no medical purpose for the prescription. Mr. Gaskey, however, provides the exception to the general rule. The fact that Mr. Gaskey had *terminal* cancer is critical to the determination of the propriety of Dr. McCarthy's actions with regard to Mr. Gaskey. The Court is not saying that the knowledge of Mr. Gaskey's illness would necessarily have convinced the Magistrate that Dr. McCarthy's actions were proper. However, the Court finds that this is definitely a fact of which the Magistrate would have wished to have been made aware.

Based upon the foregoing, the Court concludes that Dr. McCarthy *has* met his burden of establishing that Alleged Omission # 5 *is* clearly critical, and thus, it can be inferred that said omission *was* recklessly made. Accordingly, this Court concludes that all material pertaining to Mr. Gaskey must be set aside, and the Court must determine whether "the affidavit's remaining content is [sufficient or] insufficient to establish probable cause...." *Franks*, 438 U.S. at 156, 98 S.Ct. at 2676–77. The Court further concludes that the information related to Mr. Gaskey is contained on pp. 5, 33, and 34 of Agent Kopp's affidavit.

### 6. *Alleged Omission # 6*

██ Dr. McCarthy further asserts that the affiant recklessly or in bad faith omitted the fact that "[t]he affiant made abso-

lutely no effort to learn the status of the health of the remaining 1,150 (or 1517) patients whose charts were ultimately removed from the premises prior to the execution of the Affidavit (Transcript, p. 185, lines 1–4)." (Doc. # 43, at 7). This Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 6 is clearly critical, and thus it cannot be inferred that said omission was made recklessly or in bad faith.

The affiant did not claim to know the status of the health of Dr. McCarthy's remaining patients. The very purpose of obtaining the search warrant was to enable the DEA to investigate Dr. McCarthy's relationship with his other patients. Further, any inquiries as to the health of the remaining patients would probably have been futile. It is doubtful that very many persons would admit that the prescriptions which they were obtaining were unnecessary.

Once again, it appears that Dr. McCarthy would have this Court require the affiant to produce proof of guilt beyond a reasonable doubt or guilt to an absolute certainty before obtaining a search warrant. As previously noted, neither standard nor degree of proof is required for the issuance of a search warrant.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 6 is clearly critical, and thus this Court cannot conclude that the affiant made this omission recklessly or in bad faith.

### 7. *Alleged Omission # 7*

██ Dr. McCarthy next asserts that the affiant recklessly or in bad faith omitted the fact that "[t]he affiant had 'no idea' whether or not Dr. McCarthy's remaining patients (other than the five identified patients) were receiving drugs for ethical, medical purposes (Transcript, p. 185, lines 5–9)." (Doc. # 43, at 7). For the same reasons discussed with regard to Alleged Omission # 6, this Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 7 is clearly critical, and thus, this Court cannot con-

clude that said omission was made recklessly or in bad faith.

### 8. *Alleged Omission #8*

 Dr. McCarthy also asserts that the affiant recklessly or in bad faith failed to inform the Magistrate that "[t]he affiant had reviewed search warrant paperwork which indicated that the Dayton Police Department had already seized the medical records of Gail Hamm, John Hamm, Roger Taylor, and Robert Taylor, the individuals suspected of having received prescriptions for non-therapeutic purposes from Dr. McCarthy (Transcript, page 215, line 3 through page 216, line 7, and Exhibit A and Exhibit B)." (Doc. # 43, at 7). The Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 8 is clearly critical, and thus, the Court cannot infer that said omission was made recklessly or in bad faith.

The medical records of Gail Hamm, John Hamm, Roger Taylor, and Robert Taylor were confiscated by the Dayton Police Department in 1979 (Transcript, at 213). The affiant was seeking a search warrant in September, 1984. Clearly, five year old records would not have greatly aided the Magistrate in determining whether probable cause existed in 1984.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 8 is clearly critical, and thus, the Court cannot conclude that said omission was made recklessly or in bad faith.

### 9. *Alleged Omission #9*

 Dr. McCarthy next asserts that the affiant recklessly or in bad faith failed to inform the Magistrate that "[t]he informant never purchased drugs from Dr. McCarthy, but received prescriptions (Transcript, page 189, lines 5 & 6)." (Doc. # 43, at 7). The Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 9 is clearly crit-

ical, and thus, the Court cannot infer that said omission was made recklessly or in bad faith.

This Court concludes that the affiant was quite specific with regard to the fact that the confidential informant generally received prescriptions for various controlled substances, and not the controlled substances themselves. (*See* Kopp Affidavit, at 4, 5, 7, 8, 42, 43, 44, 45, and 49). This Court does not believe that Agent Kopp's testimony that the confidential informant did not purchase anything from Dr. McCarthy was intended by Kopp to indicate that the affidavit incorrectly stated that the confidential informant had received controlled substances themselves from Dr. and Mrs. McCarthy on occasion (Transcript, at 189).[2] This Court concludes that what Agent Kopp was trying to convey was that Dr. McCarthy was basically involved in dispensing prescriptions and not controlled substances themselves and that when prescriptions were issued, the confidential informant received the actual controlled substance elsewhere. Further, even if the occasions upon which the confidential informant allegedly received controlled substances themselves from Dr. or Mrs. McCarthy are disregarded, there is still substantial evidence with regard to improprieties in the prescription of controlled substances.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 9 is clearly critical to the Magistrate's finding of probable cause. Thus, this Court cannot conclude that said omission was made recklessly or in bad faith.

### 10. *Alleged Omission #10*

 Dr. McCarthy further asserts that the affiant recklessly or in bad faith failed to inform the Magistrate of the fact that "[t]he primary access to Dr. McCarthy's office to patients is off of the front porch

---

**2.** On page 42 of the Kopp Affidavit, the affiant indicated that "[t]he CI [confidential informant] stated [that on September 12, 1983] Dr. McCarthy gave him/her ... Halcion for his/her mother." On pages 42 and 43 of his Affidavit, the affiant indicated that on November 21, 1983, the confidential informant received an envelope containing Phendimetrazine from Dr. McCarthy. Finally, on pages 43 and 44, the affiant indicates that on January 5, 1984, the confidential informant received an envelope containing Phendimetrazine from Mary McCarthy.

off of North Main Street, and the affiant made no attempt to determine who or how many individuals came in and out the primary door or to set up any surveillance on the primary access door to the office (Transcript, page 191, line 20 through page 193, line 8)." (Doc. #43, at 7). The Court concludes that Dr. McCarthy *has* met his burden of establishing that Alleged Omission # 10 *is* clearly critical, and thus, that it may be inferred that the affiant *recklessly* made said omission.

The affiant is basically alleging that prescriptions for controlled substances were issued when Dr. McCarthy was absent from his office,[3] *and* that persons who were not present at Dr. McCarthy's office were receiving prescriptions for controlled substances.[4] Clearly, the Magistrate could not make an informed decision as to a person's presence or absence based upon DEA surveillance without knowledge that there was another entrance which was not under surveillance.

Based upon the foregoing, the Court concludes that Dr. McCarthy *has* met his burden of establishing that Alleged Omission # 10 *is* clearly critical, and thus, the Court may infer that said omission was *recklessly* made. Accordingly, this Court must determine, whether after the material cited in footnotes 3 and 4 is set aside, there remains sufficient evidence within the affidavit to establish probable cause.

### 11. *Alleged Omission # 11*

Dr. McCarthy next asserts that the affiant recklessly or in bad faith failed to inform the Magistrate that "[t]he affiant had no means of knowing whether or not the individuals to whom medication was prescribed by Dr. McCarthy were personally examined by Dr. McCarthy (Transcript,

page 202, lines 8–13)." (Doc. # 43, at 8). This Court concludes that Dr. McCarthy *has* met his burden of establishing that Alleged Omission # 11 *is* clearly critical, and thus, the Court may infer that said omission was *recklessly* made.

The Court's conclusion that Dr. McCarthy *has* met his burden of establishing that Alleged Omission # 11 is clearly critical is based upon the same analysis employed with regard to Alleged Omission # 10. The Court concludes that Alleged Omission # 11 is critical *only* insofar as it relates to situations in which the affiant's allegations were based *solely* upon the surveillance of the DEA. Where there is independent evidence that a patient for whom controlled substances was prescribed was not examined, it cannot be said that the affiant had no means of knowing whether or not said patient was personally examined by Dr. McCarthy.

Based upon the foregoing, the Court concludes that Dr. McCarthy *has* met his burden of establishing that Alleged Omission # 11 *is* clearly critical as it relates to those allegations based solely upon the DEA's surveillance. Thus, as Alleged Omission # 11 relates to said surveillance, the Court can infer that this omission was recklessly made. Accordingly, the materials cited in footnote 4, relating to the absence of particular patients, will be set aside, and the Court will consider the sufficiency of the affidavit's remaining evidence in determining the existence of probable cause.

### 12. *Alleged Omission # 12*

Dr. McCarthy next asserts that the affiant recklessly or in bad faith failed to inform the Magistrate that "[t]he affiant had no idea whether or not the persons to

---

**3.** A number of the affiant's allegations with regard to Dr. McCarthy's absence are predicated *solely* upon the surveillance conducted by the DEA. Based upon said surveillance, it is alleged that Dr. McCarthy was absent on May 23, 1983 (Kopp Affidavit, at 8–11) and on June 9, 1983 (Kopp Affidavit, at 22–27).

**4.** A number of the allegations concerning the absence of persons to whom prescriptions were issued are also based *solely* upon the DEA's surveillance. Based solely upon said surveillance, the affiant alleged that prescriptions for

controlled substances were issued to persons who were absent on May 24, 1983 (Kopp Affidavit, at 11–12), May 26, 1983 (Kopp Affidavit at 12–15), May 27, 1983 (Kopp Affidavit, at 15–16), May 31, 1983 (Kopp Affidavit, at 16–17), June 2, 1983 (Kopp Affidavit, at 17–18), June 3, 1983 (Kopp Affidavit, at 19), June 7, 1983 (Kopp Affidavit, at 19–22), June 10, 1983 (Kopp Affidavit, at 27–28), June 20, 1983 (Kopp Affidavit, at 28–29), June 21, 1983 (Kopp Affidavit at 29–30), and June 23, 1983 (Kopp Affidavit, at 30–31).

whom prescriptions were written by Dr. McCarthy actually received the medication (Transcript, page 202, lines 14–18)." (Doc. # 43, at 8). The Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 12 is clearly critical, and thus, the Court may not infer that said omission was made recklessly or in bad faith.

The Court notes that affiant did not indicate to the Magistrate that the persons to whom prescriptions for controlled substances were issued did or did not receive said substances. Once again, the affiant's key allegation is that the persons to whom prescriptions for controlled substances were issued were not present, and thus, could not have been physically examined. Whether such persons actually received the prescribed medication is irrelevant for such a fact would not establish that the controlled substances were prescribed for legitimate medical purposes.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 12 is clearly critical, and thus, the Court cannot conclude that said omission was made recklessly or in bad faith.

### 13. *Alleged Omission # 13*

Dr. McCarthy further asserts that the affiant recklessly or in bad faith failed to inform the Magistrate that "[t]he affiant had no idea whether or not the persons to whom prescriptions were written actually had medical conditions which required the ethical prescription of pharmaceuticals (Transcript, page 202, lines 19–23)." (Doc. # 43, at 8). The Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 13 is clearly critical, and thus, the Court cannot infer that said omission was made recklessly or in bad faith.

The affiant did not represent to the Magistrate that the individuals to whom prescriptions were written did *not* have medical problems. Once again, the key consideration is not whether such individuals had medical problems, but instead, whether such individuals were examined prior to the issuance of a prescription for a controlled substance. In addition, Dr. McCarthy once more appears to be requesting that this Court demand proof to an absolute certainty or beyond a reasonable doubt when such is not the standard upon which the issuance of search warrants is based. In seeking the search warrant, the DEA was attempting to determine whether Dr. McCarthy was indeed prescribing controlled substances for legitimate, medical reasons.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 13 is clearly critical, and thus, the Court cannot infer or conclude that said omission was made recklessly or in bad faith.

### 14. *Alleged Omission # 14*

Dr. McCarthy next asserts that the affiant recklessly or in bad faith failed to inform the Magistrate that "[t]he affiant knew that the only rational way to determine the potency of drugs was by stating the strength in milligrams and that no attempt was made to advise the Magistrate as to the potency of any drug that Dr. McCarthy was prescribing (as opposed to purchasing) ... stated in terms of milligrams (Transcript, page 217, line 18 through page 218, line 10), not 'unit doses' as was stated in the affidavit." (Doc. # 43, at 8). The Court concludes that Dr. McCarthy *has* met his burden of establishing that Alleged Omission # 14 *is* clearly critical to the Magistrate's determination as said omission relates to the comparison found on pages 47 through 49 of Agent Kopp's affidavit. Accordingly, the Court concludes that it may infer that said omission was *recklessly* made.

The affiant does compare the dosage units of certain controlled substances prescribed by Dr. McCarthy with those dosage units purchased by Grandview and Miami Valley Hospitals (Kopp Affidavit, at 47–49). However, information concerning the total number of milligrams is provided only with regard to the prescriptions/purchases of Valium and Placidyl (Kopp Affidavit, at 49). There is nothing in the affidavit to indicate that all dosage units of a particular drug are *not* equal. Without the

knowledge that the potency of dosage units can differ (and as the affiant was directly comparing the prescriptions/purchases), the Magistrate may well have *presumed* that all dosage units of a particular controlled substance are equal. As the potency of the dosage units prescribed by Dr. McCarthy may have differed from that of the dosage units prescribed by Grandview and/or Miami Valley, such a presumption is quite simply unfair to Dr. McCarthy. Differences in dosage or potency could have a significant impact upon the comparison which the affiant is attempting to make. Dr. McCarthy might have been prescribing medication with a lower dosage. As a result, two or more of the pills prescribed by Dr. McCarthy might be the equivalent of one of the pills purchased by Grandview or Miami Valley.

Based upon the foregoing, the Court concludes that Dr. McCarthy *has* met his burden of establishing that Alleged Omission # 14 *is* clearly critical, and that the Court may infer that said omission was *recklessly* made. Accordingly, the Court concludes that the material concerning the comparison of Dr. McCarthy's prescriptions to the purchases made by Grandview Hospital and Miami Valley Hospital (with the exception of that material regarding the prescription/purchase of Valium and Placidyl) must be set aside, and the Court must determine whether the affidavit's remaining evidence is sufficient to establish probable cause.

### 15. *Alleged Omission # 15*

■ Dr. McCarthy next asserts that the affiant recklessly or in bad faith omitted the fact that:

Although attempting to characterize Dr. McCarthy as writing prescriptions excessively, the affiant made no attempt to relate the total number of milligrams or unit doses of any of the drugs listed to the size of Dr. McCarthy's patient load or the manufacturer's suggested daily dosage for any of the drugs (Transcript, page 224, line 12 through page 225, line 7). (Affiant admitted on cross examination that there was, in fact, no one substance that there were too many of dur-

ing the relevant time period indicated in the Affidavit to indicate that Dr. McCarthy was prescribing to more than his patient load (Transcript, page 227, lines 8–11).)

(Doc. # 43, at 8). The Court concludes that Dr. McCarthy *has* met his burden of establishing that Alleged Omission # 15 *is* clearly critical, and thus, that it may be inferred that said omission was *recklessly* made.

On page 51 of his Affidavit, Agent Kopp provides a list of those controlled substances purchased by Dr. McCarthy between January 1, 1983 and March 29, 1984. This Court concludes that the sheer number of drugs purchased by Dr. McCarthy is meaningless unless there is some indication as to the amount of drugs which could conceivably be legitimately prescribed during the purchase period. While of course relating the total number of milligrams or unit doses to the size of Dr. McCarthy's patient load or to the manufacturer's suggested daily dosage would not be dispositive (for every patient might not have a legitimate, medical need for controlled substances), this type of information could at least give the Magistrate some point of reference.

Based upon the foregoing, the Court concludes that Dr. McCarthy *has* met his burden of establishing that Alleged Omission # 15 *is* clearly critical and that the Court may infer that said omission was *recklessly* made. Accordingly, the Court must set aside the information provided with regard to Dr. McCarthy's purchase of Schedule III controlled substances (Kopp Affidavit, at 51) and consider whether the Affidavit's remaining evidence is sufficient to support a finding of probable cause.

### 16. *Alleged Omission # 16*

■ Dr. McCarthy next asserts that the affiant recklessly or in bad faith failed to inform the Magistrate that "[a]ffiant made absolutely no comparison of Dr. McCarthy's practice of writing prescriptions with other physicians prior to applying for the search warrant (Transcript, page 206, line 8 through page 207, line 9)." (Doc. # 43, at 9). The Court concludes that Dr. McCarthy has *not* met his burden of establishing that

Alleged Omission #16 is clearly critical, and thus that it cannot be inferred that said omission was made recklessly or in bad faith.

Once again, it is important to note that the affiant was attempting to establish probable cause, not proof beyond a reasonable doubt or to an absolute certainty. It might well be that evidence concerning other physicians' practice of writing prescriptions would be relevant in a trial upon the merits. However, the inclusion of such evidence in an affidavit in support of a search warrant would probably have been unwise. One doctor's medical practice is not necessarily comparable to that of another. The affiant could well have unintentionally misled the Magistrate by attempting to compare Dr. McCarthy's practice of writing prescriptions with that of another physician.[5]

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission #16 is clearly critical, and thus, the Court cannot conclude that said omission was made recklessly or in bad faith.

### 17. *Alleged Omission #17*

█ Defendant next contends that the affiant recklessly or in bad faith omitted the fact that "Thomas H. McCarthy, D.O., was a physician in good standing licensed by the Ohio Medical Board (Transcript, page 205, lines 3–5)." (Doc. #43, at 9). The Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission #17 is clearly critical, and thus, it cannot be inferred that said omission was made recklessly or in bad faith.

The Court notes that the affiant did indicate that Dr. McCarthy was a doctor of osteopathy (Kopp Affidavit, at 1), and that he was registered to administer, dispense and prescribe controlled substances (Kopp Affidavit at 51). There was no reason for the Magistrate to assume that Dr. McCarthy was unlicensed, and this Court cannot

conclude that affiant was required to state the obvious.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission #17 is clearly critical, and thus the Court cannot conclude that said omission was made recklessly or in bad faith.

### 18. *Alleged Omission #18*

█ Dr. McCarthy further asserts that the affiant recklessly or in bad faith failed to tell the Magistrate that "Mary McCarthy was a licensed, registered nurse (Transcript, page 203, lines 7 & 8 and lines 20–23)." (Doc. #43, at 9). The Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission #18 is clearly critical, and thus, that there can be no inference that said omission was made recklessly or in bad faith.

The affiant did indicate that Mary Elizabeth McCarthy did not have a medical license or a DEA registration (Kopp Affidavit, at 51). Whether Mrs. McCarthy was a registered nurse or not, she was not registered to prescribe controlled substances, and that is what is truly important about the allegations concerning Mrs. McCarthy.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission #18 is clearly critical. Accordingly, the Court cannot conclude that the affiant made said omission recklessly or in bad faith.

### 19. *Alleged Omission #19*

█ Dr. McCarthy next asserts that the affiant knowingly or in bad faith failed to inform the Magistrate that "[t]he affiant intended to include a State of Ohio Medical Board investigator on the raid even though the medical records sought by the affiant were ones which were protected by a stay of execution procured by Dr. McCarthy (Transcript, page 243, line 15 through page 244, line 5, and page 254, lines 5–20)." (Doc. #43, at 9). The Court concludes that Dr. McCarthy has *not* met his burden of

---

**5.** It would be difficult if not impossible to find a physician whose patients were comparable to

those of Dr. McCarthy.

establishing that Alleged Omission # 19 is clearly critical, and thus, that the Court cannot infer that said omission was made recklessly or in bad faith.

The persons involved in a particular search are *not* relevant to the issue of probable cause. The presence or absence of a State of Ohio Medical Board investigator simply did not impact upon the "probability that contraband or evidence of a crime" would be found at 1328 North Main Street. *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 19 is clearly critical, and thus, that the Court cannot conclude that the affiant made said omission recklessly or in bad faith.

### 20. *Alleged Omission # 20*

■ Dr. McCarthy next asserts that the affiant recklessly or in bad faith failed to inform the Magistrate that "[t]he affiant had no idea as to what Dr. McCarthy was or was not charging for [i.e. whether he was charging by the prescription or by the office call] (Transcript, page 290, lines 6–9)." (Doc. # 43, at 9). The Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 20 is clearly critical, and thus, this Court cannot infer that said omission was made recklessly or in bad faith.

Whether Dr. McCarthy was charging by the office call or by the prescription, the prescription of controlled substances in the absence of a proper physical examination is evidence of a violation of 21 U.S.C. § 841.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 20 is clearly critical to the Magistrate's finding of probable cause. Therefore, the Court cannot conclude that said omission was made recklessly or in bad faith.

### 21. *Alleged Omission # 21*

■ Dr. McCarthy further asserts that the affiant recklessly or in bad faith failed to inform the Magistrate that "[a]ffiant had no information concerning irregular billing practices employed by Dr. McCarthy (Transcript, page 290, lines 23–25)." (Doc. # 43, at 9). The Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 21 is clearly critical, and thus, that the Court cannot infer that the affiant made said omission recklessly or in bad faith.

The reasoning applied with regard to Alleged Omission # 20 is equally applicable to Alleged Omission # 21. Evidence concerning irregular billing is simply not crucial to a finding of probable cause. Once again, Dr. McCarthy would have this Court require the affiant to establish proof beyond a reasonable doubt or to an absolute certainty when all that is required is a probability. Probable cause does not require proof beyond a reasonable doubt.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 21 is clearly critical, and thus, the Court cannot conclude that said omission was made recklessly or in bad faith.

### 22. *Alleged Omission # 22*

■ Dr. McCarthy next asserts that the affiant recklessly or in bad faith failed to inform the Magistrate that "[a]ffiant had no evidence to indicate that Dr. McCarthy was the recipient of large quantities of money (Transcript, page 201, lines 4–6)." (Doc. # 43, at 9). The Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 22 is clearly critical to the Magistrate's finding of probable cause. Therefore, the Court cannot infer that said omission was made recklessly or in bad faith.

Nowhere is it written that all of those engaged in the illicit drug trade possess large quantities of money. Dr. McCarthy did not have to be making a large profit (or retaining any profit that he made) in order to be violating 21 U.S.C. § 841.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 22 is clearly critical, and thus, the

Court cannot conclude that this omission was made recklessly or in bad faith.

### 23. *Alleged Omission # 23*

■ Dr. McCarthy next asserts that the affiant recklessly or in bad faith failed to inform the Magistrate that "[a]ffiant had no evidence to indicate that Dr. McCarthy was disposing of large quantities of money (Transcript, page 201, lines 7–9)." (Doc. # 43, at 9). The Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 23 is clearly critical to the Magistrate's finding of probable cause, and thus, the Court cannot infer that said omission was made recklessly or in bad faith.

The analysis applied to Alleged Omission # 22 is equally applicable to Alleged Omission # 23. While possessing or spending large sums of money may be evidence of illegal drug sales, the fact that one does not possess or spend such money does not necessarily indicate that one is not engaging in such sales.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 23 is clearly critical, and thus, the Court cannot conclude that said omission was made recklessly or in bad faith.

### 24. *Alleged Omission # 24*

■ Dr. McCarthy further asserts that the affiant recklessly or in bad faith failed to inform the Magistrate that "[t]here was nothing about Dr. McCarthy's personal finances that indicated that he had at his disposal large quantities of money normally associated with drug pushers (Transcript, page 291, lines 10, 23)." (Doc. # 43, at 9). The Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 24 is clearly critical to the Magistrate's finding of probable cause, and thus, this Court cannot infer or conclude that said omission was made recklessly or in bad faith.

The analysis applied to Alleged Omission # 22 and Alleged Omission # 23 is equally applicable to Alleged Omission # 24. Once again, the Court must note that the affiant need *not* establish proof beyond a reasonable doubt or proof to an absolute certainty. In effect, Dr. McCarthy's counsel is faulting the affiant for not raising issues that he himself would raise during any trial on the merits concerning this matter.

Based upon the foregoing, this Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 24 is clearly critical, and thus, this Court cannot conclude from said omission that said omission was made recklessly or in bad faith.

### 25. *Alleged Omission # 25*

■ Dr. McCarthy next asserts that the affiant recklessly or in bad faith failed to inform the Magistrate that:

The only activity of Dr. McCarthy concerning the prescribing of pharmaceuticals to patients, of which the affiant had knowledge, for fourteen (14) months proceeding the raid was Gail Hamm, whose medical records affiant could have obtained on request. Gail Hamm was sent out the day before the raid for "one more" controlled visit in order to save a search warrant and affidavit which was obviously based upon stale information (Transcript, page 190, line 20 through page 191, line 5), since all of the Affidavit had been typed out prior to sending the informant on a controlled visit on September 6, 1984 (Transcript, p. 260, lines 9–13).

(Doc. # 43, at 10). The Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 25 is clearly critical, and therefore that the Court cannot infer that said omission was made recklessly or in bad faith.

The Court will discuss the "staleness" of the information provided in Agent Kopp's affidavit in greater detail in Section B of this Decision. With regard to Alleged Omission # 25, the Court finds the amount of detail provided by the affiant to be dispositive. The affiant *clearly* noted the dates on which illegal activity was suspected. No effort was made to conceal any gaps of time. Any such gaps of time were obvious to the Magistrate.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his

burden of establishing that Alleged Omission # 25 is clearly critical to the Magistrate's finding of probable cause, and thus, the Court cannot conclude that said omission was made recklessly or in bad faith.

### 26. *Alleged Omission # 26*

 Finally, Dr. McCarthy asserts that the affiant recklessly or in bad faith failed to inform the Magistrate that:

> The affiant knew the total quantity of drugs prescribed by Dr. McCarthy (Transcript, page 228, lines 4–13), which was admitted to be less than enough to supply a medical practice of 1,500 patients. The attribution of the distribution of 50 percent of the illicit controlled substances in Dayton and 10 percent in Hamilton (Transcript, page 227, lines 21–23), when the affiant made no attempt to determine the total (Transcript, page 229, lines 12–19) or consider the numerous substances which fit that description, was a blatant attempt to conceal and/or distort what the affiant knew to be true in order to procure the acquiesence of the Magistrate to the characterization of Dr. McCarthy as a drug pusher (Transcript, page 231, line 1 through page 233, line 20).

(Doc. # 43, at 10). This Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 26 is clearly critical to the Magistrate's finding of probable cause, and thus, the Court cannot infer that said omission was made recklessly or in bad faith.

In his affidavit, Agent Kopp merely states that he was *told* that Dr. McCarthy supplied 50 percent of the controlled substances illicitly sold in Dayton, Ohio (Kopp Affidavit, at 2), and that he was *told* that Dr. McCarthy supplied 10 percent of the controlled substances illicitly sold in Hamilton, Ohio (Kopp Affidavit, at 3). Agent Kopp does not indicate that these figures were the result of a scientific survey, nor does he indicate whether he feels that these figures are accurate. The affiant

could safely assume that the Magistrate was not going to place great reliance upon these figures.

Based upon the foregoing, the Court concludes that Dr. McCarthy has *not* met his burden of establishing that Alleged Omission # 26 is clearly critical to the Magistrate's finding of probable cause and thus, the Court cannot conclude that the affiant made said omission recklessly or in bad faith.

### 1. *The Existence of Probable Cause and the Remaining Content of the Affidavit*

 "The effect of the misrepresentations and omissions on the existence of probable cause is considered cumulatively." *Stanert,* 762 F.2d at 782. Thus, this Court is faced with determining whether taken *cumulatively,* Alleged Omission # 5 (which relates to Dr. McCarthy's treatment of Mr. Gasky), Alleged Omission # 10 (which relates to the reliability of the DEA's surveillance of Dr. McCarthy's office), Alleged Omission # 11 (which also relates to the reliability of the DEA's surveillance of Dr. McCarthy's office), Alleged Omission # 14 (which relates to the comparison of Dr. McCarthy's prescriptions to the purchases made by Grandview Hospital and Miami Valley Hospital), and Alleged Omission # 15 (which relates to Dr. McCarthy's purchase of Schedule III controlled substances) were material to the Magistrate's determination of probable cause.[6] *Franks,* 438 U.S. at 156, 98 S.Ct. at 2676–77. The Court concludes that even when those portions of the Affidavit which were effected by said omissions are set to one side, the Affidavit's remaining content *is* sufficient to establish probable cause.

First, even after the information based solely upon the DEA's surveillance (Alleged Omission # 10, Alleged Omission # 11) is set aside, there is evidence that even during periods in which Dr. McCarthy was absent from his office, large quantities

---

**6.** The Court notes that as it determined that Alleged Omission # 5, Alleged Omission # 10, Alleged Omission # 11, Alleged Omission # 14, and Alleged Omission # 15 were *recklessly* made, it was unnecessary for the Court to consider whether said omissions were made in bad faith. Omissions made recklessly and omissions made in bad faith are treated identically. Both require the setting aside of related materials contained in the affidavit.

of controlled substances were prescribed and/or dispensed. Detective Mark J. Varvel of the Dayton Police Department Organized Crime Unit indicated that he visited Dr. McCarthy's offices as a patient on February 18, 1983 (Kopp Affidavit, at 33). At that time, Mary McCarthy stated that Dr. McCarthy was home sick with the flu (Kopp Affidavit, at 33). However, Mary McCarthy dispensed tablets to both Detective Varvel and the confidential informant (Kopp Affidavit, at 33). Said tablets were later analyzed at the Miami Valley Regional Crime Laboratory and found to be a Schedule III controlled substance known as SBP (Kopp Affidavit, at 34). Further, when the affiant reviewed the prescriptions seized from Kalt Rexall Drugs, he discovered "108 prescriptions for controlled substances, dated February 18, 1983 [the same date as Varvel's visit to Dr. McCarthy's office], bearing Dr. McCarthy's signature and listing Dr. McCarthy as the issuing physician." (Kopp Affidavit, at 34). The affidavit also indicates that on May 10, 1983, Detective Varvel and the confidential informant once again visited Dr. McCarthy's office and once again were informed that Dr. McCarthy was home sick (Kopp Affidavit, at 38–39). Mary McCarthy informed Detective Varvel and the confidential informant that Dr. McCarthy would not return until May 12, 1983 (Kopp Affidavit, at 39). Detective Varvel and the confidential informant returned to Dr. McCarthy's office on May 12, 1983, only to be informed that Dr. McCarthy was still ill and would be out of the office until May 16, 1983 (Kopp Affidavit, at 39). When the affiant reviewed the prescriptions seized from Kalt Rexall Drugs for the dates May 10, 1983, May 11, 1983, May 12, 1983, and May 13, 1983, (dates upon which Dr. McCarthy was supposedly home sick) the affiant discovered 58 prescriptions for controlled substances, dated May 10, 1983 and listing Dr. McCarthy's signature or naming Dr. McCarthy as the issuing physician; 43 prescriptions for controlled substances, dated May 11, 1983, and listing Dr. McCarthy's signature or naming Dr. McCarthy as the issuing physician; 84 prescriptions for controlled substances, dated May 12, 1983, and listing Dr. McCarthy's signature or naming Dr. McCarthy as the issuing physician; and 45 prescriptions for controlled substances, dated May 13, 1983, and listing Dr. McCarthy as the issuing physician. (Kopp Affidavit at 35–38).

Further, even after the information relating to Mr. Gasky (Alleged Omission # 5) and the information based solely upon the DEA's surveillance (Alleged Omission # 10 and Alleged Omission # 11) are set aside, there is evidence that Dr. McCarthy was prescribing controlled substances for persons who were not even present at his office. The confidential informant told the affiant that she had been getting prescriptions for controlled substances in her spouse's name and that her spouse had not been required to visit Dr. McCarthy's office or undergo a physical examination (Kopp Affidavit, at 4). Further, "[t]he CI [confidential informant] stated that on three (3) occasions he/she has received controlled substances or prescriptions for controlled substances from Dr. McCarthy and Mary McCarthy in his/her mother's name. The CI stated his/her mother has *never* been seen by Dr. McCarthy as a patient." (Kopp Affidavit, at 5) (emphasis added). In addition, the confidential informant told the affiant that on January 5, 1984, after the informant indicated that her spouse could not come into Dr. McCarthy's office, Mary McCarthy wrote a prescription for 100 Talwin–NX in said spouse's name (Kopp Affidavit, at 43–44).

There is also evidence that Dr. McCarthy was dispensing prescriptions for controlled substances without conducting any and/or a proper physical examination. The confidential informant indicated that on numerous occasions, she received prescriptions for controlled substances without *any* physical examination by Dr. McCarthy (Kopp Affidavit, at 4, 7–8, 40) or after Dr. McCarthy and/or Mary McCarthy merely checked her weight, listened to her heart, and/or took her blood pressure (Kopp Affidavit, at 43, 44, 45, 49–50). Detective Varvel indicated to the affiant that during a visit to Dr. McCarthy which occurred on January 28, 1983, Dr. McCarthy gave De-

tective Varvel an envelope containing SBP tablets, a Schedule III controlled substance, without conducting *any* physical examination (Kopp Affidavit, at 32–33). Finally, on May 27, 1983, the affiant observed Detective Varvel and the confidential informant approach the rear door of Dr. McCarthy's office and encounter one of Dr. McCarthy's employees (Kopp Affidavit, at 40). According to Detective Varvel, the confidential informant requested that the employee ask Dr. McCarthy for a prescription for Talwin, and shortly thereafter, Dr. McCarthy appeared at the rear door and gave the confidential informant "a prescription which was written for 100 Talwin and 100 Valium (both [of which] are Schedule IV controlled substances)." (Kopp Affidavit, at 40). There is no indication that the confidential informant was even required to step into the building to receive a prescription for a controlled substance.

The United States Supreme Court has held that in determining whether probable cause exists for the issuance of a search warrant:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place....

*Gates*, 462 U.S. at 238, 103 S.Ct. at 2332. After examining the affidavit submitted in support of the warrant of September 7, 1984, this Court concludes that even after *all* of those portions of the affidavit which were effected by the reckless omissions of the affiant are set aside, the affidavit's remaining content is sufficient to establish probable cause. As previously discussed, even in the absence of the materials concerning Mr. Gasky (Alleged Omission # 5) and the materials related to the DEA's surveillance (Alleged Omission # 10 and Alleged Omission # 11), there is ample evidence that prescriptions for controlled substances and/or controlled substances were dispensed in Dr. McCarthy's absence and

that prescriptions for controlled substances and/or controlled substances were dispensed by Dr. McCarthy without any physical examination or without a proper physical examination. Further, in the face of such evidence, the information relating to the comparison of Dr. McCarthy's prescriptions to the purchases made by Grandview and Miami Valley Hospital (Alleged Omission # 14) and the information relating to Dr. McCarthy's purchase of Schedule III controlled substances (Alleged Omission # 15) is simply not needed to establish probable cause. Even after the materials relating to Alleged Omission # 14 and Alleged Omission # 15 are set aside, there is still ample evidence set forth in the affidavit to the effect that Dr. McCarthy was prescribing and/or dispensing controlled substances without conducting a proper physical exam (i.e. that he was acting "outside the course of professional practice"). *See U.S. v. Moore*, 423 U.S. 122, 124, 96 S.Ct. 335, 337, 46 L.Ed.2d 333 (1975). Based upon an analysis of all of the *remaining* material in the affidavit, this Court concludes that there was a fair probability that contraband or evidence of a violation of 21 U.S.C. §§ 841(a)(1) and 846 would be found at 1328 North Main Street, Dayton, Ohio, on September 7, 1984.

Based upon the foregoing, the Court concludes that the search warrant issued by Magistrate Steinberg on September 7, 1984, need *not* be voided on the basis that the affidavit's remaining content was insufficient to establish probable cause.

### B. *The "Staleness" Issue*

█ In his Memorandum in Support of Motion to Return Property, Dr. McCarthy asserts that the warrant issued on September 7, 1984, was based upon stale information (Doc. # 43, at 12). As noted in Section A, Alleged Omission # 25, of this Decision, the Court cannot conclude that Dr. McCarthy met his burden of establishing that the affiant omitted any clearly critical facts relating to the timeliness of the information provided to the Magistrate. However, as the Court found it necessary to set aside certain material which it concluded was

effected by certain reckless omissions by the affiant, the Court finds it necessary to examine the impact of said removals upon the issue of "staleness".

Normally "the duty of a reviewing court is simply to insure that the Magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Gates,* 462 U.S. at 238–39, 103 S.Ct. at 2332–33. However, in the case at bar, as portions of the affidavit reviewed by the Magistrate have been set aside, the Court believes that a *de novo* review is required on the issue of "staleness". "The timeliness of probable cause cannot be assessed in a factual vacuum. Rather, timeliness and its converse, staleness, must be measured by the *nature and regularity* of the allegedly unlawful activity." *United States v. Nilsen,* 482 F.Supp. 1335, 1339 (D.N.J.1980). One key factor to be considered is whether the Magistrate can "independently determine from the affidavit that 'there was no reason to believe that ... [the] operation had ceased.'" *Id. (Quoting United States v. Forsythe,* 560 F.2d 1127, 1132 (3d Cir. 1977)). In the recent case of *United States v. Word,* 806 F.2d 658, 662 (6th Cir.1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1383, 94 L.Ed.2d 697 (1987), the Sixth Circuit in denying a claim of staleness, placed great emphasis upon the fact that "the events alleged in the affidavit were of a continuing nature and the documents sought were business records prepared and kept in the ordinary course of business." Based upon the foregoing, this Court concludes that two key questions must be answered with regard to the issue of staleness. *First,* are the events alleged in the affidavit part of a continuing violation? *Second,* is there some evidence that said violation has continued to the present day (or in this case the date upon which the warrant was initially sought, September 7, 1984)?

■ In the case at bar, it is clear that the affiant is asserting that there was a continuing violation. Agent Kopp indicates that Dr. McCarthy regularly dispenses controlled substances for non-medical purposes (Kopp Affidavit, at 52). Further, the confidential informant's visit of September 6, 1984, provided evidence that Dr. McCarthy's method of dispensing prescriptions continued to be questionable (Kopp Affidavit, at 49–50). In other words, there is evidence that the violation has continued to the present day, i.e. the day the affidavit was sworn to and the search warrant issued. Finally, as in the *Word* case, the documents sought by the DEA were "business records prepared and kept in the ordinary course of business." *Word,* 806 F.2d at 662.

Based upon the foregoing, and after considering all of the events set forth in the affidavit, this Court cannot conclude that the facts set forth in Agent Kopp's affidavit were stale. Accordingly, this Court finds that the timeliness of the information provided by Agent Kopp does not effect the existence of probable cause.

### C. *Probable Cause And The Breadth Of The Search Authorized By The Warrant of September 7, 1984*

■ The next issue before the Court is whether there was probable cause to support a search of the breadth authorized by the warrant of September 7, 1984. Dr. McCarthy asserts that the affidavit in support of the warrant did not state facts which gave rise to probable cause for the total and all-inclusive seizure of documents (Doc. # 43, at 3). Dr. McCarthy argues that "rational individuals cannot argue that an uncorroborated allegation, that five specific individuals who are alleged to be receiving prescriptions for ethical pharmaceuticals from a licensed physician for non-therapeutic reasons, can authorize the wholesale impoundment of the confidential medical files of 1,517 other unspecified individuals." (Doc. # 43, at 4–5).

The warrant issued on September 7, 1984, permitted the seizure of "records, files, charts, official order forms, purchase invoices, sample invoices, prescriptions, copies of prescriptions, appointment records, billing records for health insurance charges, dispensing records, inventories, all documents required to be made or kept under the Controlled Substances Act of 1970 (P.L. 91–513), together with other

fruits, instrumentalities, and evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846." The Court concludes that two potential problems with regard to the breadth of this warrant must be examined. The first such problem concerns the warrant's failure to set any limitations as to which patient records could be searched and/or seized. The second potential problem concerns the warrant's failure to set a limitation as to the time period within which the seized records must fall.

Although the Court would normally limit its inquiry to whether the Magistrate had a "substantial basis for ... conclud[ing] that probable cause existed", as this Court has determined that certain materials contained in the affidavit must be set aside, the Court will conduct a *de novo* review as to whether the affidavit's remaining material supports probable cause for a search of this breadth. *See Gates,* 462 U.S. at 238–39, 103 S.Ct. at 2332–33. After considering all of the circumstances set forth in the affidavit, this Court concludes that there *is* probable cause to support a search of the breadth authorized by the warrant.

■ Dr. McCarthy basically argues that the affiant relied totally upon the "uncorroborated word" of a confidential informant that she and four other persons were receiving prescriptions for controlled substances for non-medical purposes (Doc. # 43, 3–5). The Court finds this argument to be without merit. The affiant did *not* rely solely upon the information provided by the confidential informant. Among other things, the DEA itself engaged in surveillance of the 1328 North Main Street address, and the affiant witnessed Dr. McCarthy handing the confidential informant a prescription for two controlled substances at the back door of said premises (Kopp Affidavit, at 40). Further, Dr. McCarthy completely ignores the information provided by Detective Varvel as to Dr. McCarthy's absences and Dr. McCarthy's failure to adequately examine prior to prescribing controlled substances (Kopp Affidavit, at 31–34, 38–41). The confidential informant's information as to Dr. McCarthy's alleged illicit drug trade was *not* uncorroborated.

This Court concludes that there is probable cause to support a search of the records of *all* of Dr. McCarthy's patients. While Dr. McCarthy is correct in asserting that in the case of *United States v. Word,* 806 F.2d 658 (6th Cir.1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1383, 94 L.Ed.2d 697 (1987), the Sixth Circuit found probable cause to support a search warrant in part because said warrant specifically stated which patient records could be seized, the Sixth Circuit did not indicate that a warrant which would allow the seizure of all patient records could not be supported by probable cause. In the case at bar, based upon the affidavit sworn in support of the search warrant, there is evidence that the illegal diversion of controlled substances permeated Dr. McCarthy's practice. The sheer volume of drugs prescribed while Dr. McCarthy was apparently absent from his office indicates that any illegal diversion was not limited to a few select patients (Kopp Affidavit, at 34, 35–38). There is evidence that on February 18, 1983, alone (a day upon which Mary McCarthy represented to Detective Varvel that Dr. McCarthy was not present at his office), Dr. McCarthy issued 108 prescriptions for controlled substances (Kopp Affidavit, at 34). Further, Detective Varvel, a new patient, was allegedly able to obtain a controlled substance from Dr. McCarthy without undergoing a physical examination (Kopp Affidavit, at 31–33).

"Where a warrant authorizes the seizure of particularly described records relevant to a specific crime and all of an organization's records, in fact, fall into that category, they may all be lawfully seized." *Voss v. Bergsgaard,* 774 F.2d 402, 406 (10th Cir. 1985). In the case at bar, there is probable cause to believe that each patient's records would provide evidence of a violation of 21 U.S.C. §§ 841(a)(1) and 846. *See generally, Williams v. Kunze,* 806 F.2d 594, 598 (5th Cir.1986) ("Where probable cause exists to believe that an entire business was merely a scheme to defraud, or that all the records of a business are likely to constitute evidence, a warrant authorizing the seizure of all such records and describing them in

generic terms is sufficient to meet the particularity requirement of the fourth amendment."); *United States v. Offices Known as 50 State Distributing Co.*, 708 F.2d 1371, 1374 (9th Cir.1983) ("While the seizure was extraordinarily broad, and in that sense 'general', under the particular facts of this case, the scope of the warrant was justified. It was not possible through more particular description to segregate those business records that would be evidence of fraud from those that would not, for the reason that there was probable cause to believe that fraud permeated the entire business operation of 50 State."), *cert. denied*, 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 677 (1984). Based upon the foregoing, this Court concludes that probable cause did exist to search and/or seize all patient records.

■ With regard to the issue of the time period covered by the records which the warrant permitted to be seized, it is important to note that said records were probably not of a type which could be easily separated by date. For example, a patient's file would have to be dismantled in order to remove the most recent prescriptions, examinations, etc. Further, it might well have been to Dr. McCarthy's *disadvantage* for the DEA to pull isolated incidents from a particular file. A full case history might well support the issuance of a prescription for a controlled substance, when the findings of an individual and/or more recent examination or visit would not do so. Finally, the Court notes that the affidavit in support of the warrant did contain evidence that Dr. McCarthy was prescribing controlled substances for nonmedical purposes as early as 1976 (Kopp Affidavit, at 4).

Based upon the foregoing, this Court cannot conclude that the scope of the search authorized by the warrant of September 7, 1984, was overly broad.

### D. *The Scope Of The Seizure*

■ The next question before the Court is whether the officers executing the warrant seized items from Dr. McCarthy's premises which were outside the scope of the warrant. Dr. McCarthy contends that the raiders conducted an absolute and complete seizure of the premises in a general search (Doc. # 43, at 14). Dr. McCarthy specifically argues that the following were outside of the scope of the search warrant:

[T]hirty-three billing statements in rubber band, metal file marked Private Accounts Paid Medicare, metal file marked ADC, cardboard box "Private Accounts–Medicaid with balance", cardboard ADC case numbers, two drawer file contained industrial accounts and general welfare accounts, maroon vinyl "tell-address" book, brown vinyl telephone/address book, book of money receipts from 4/84 to 8/30/84, list "People on Medicare must sign Medicare for each visit", eighteen page list of names, addresses, amounts of money, letter from MBNA to McCarthy, letter from Nationwide Insurance, report from Donald Siehl, D.O. regarding Scott Matlock, deposit ticket dated September 7, 1984 amount $1,603.00, one post card from Professional Appointment Record, Inc., four discount coupons $2.00 each for Tennate Dospan, one receipt for insurance mail, number V 086796931, one explanation of Medicare benefits (Charles Sizemore), twenty receipts from Kalt Drugs, stapled together, bill of lading C449229 from O'Neal, Jones and Feldman, Inc., drug screen report from SKCL on Howard Langford, one letter from McNeil Pharmaceutical, delinquent lease notice from Xyomed, Inc. dated 4/15/82, seven Ohio Department of Public Welfare reimbursement assistance forms, six money receipt books from 1982 to 1984, one black ledger, one manilla envelope containing 1984 quarterly tax forms, file containing 1984 tax forms and receipts, file containing 1983 Welfare payments, telephone book from the top of desk, one letter, and one steno pad.

(Doc. # 11, at 39–40). The key determination which this Court must make is whether there is a logical nexus between the items seized and the criminal behavior alleged. *Warden v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967).

This Court agrees for the most part with the finding of the Magistrate that "[t]he items seized from Dr. McCarthy's office can be divided into five categories: (1) dispensing records, (2) purchase records, (3) prescriptions, (4) patient records and (5) billing records." (Doc. #17, at 4). This Court concludes that the thirty-three billing statements joined by a rubber band; the metal file marked "Private Accounts Paid Medicare"; the metal file marked "ADC"; the cardboard box marked "Private Accounts–Medicaid With Balance"; the cardboard file marked "ADC case numbers"; the two-drawer file containing industrial accounts and general welfare accounts; the book of money receipts from 4/84 to 8/30/84; the eighteen page list of names, addresses, and amounts of money; the six money receipt books from 1982 to 1984; and the file containing 1983 welfare payments all constitute billing records. Such records would indicate when, from whom, how much, and for what service Dr. McCarthy was compensated. There is cause to believe that this type of evidence could aid in establishing that Dr. McCarthy was engaged in dispensing controlled substances and/or prescriptions for controlled substances for non-medical purposes. The report from Donald Siehl, D.O., regarding Scott Matlock; the drug screen report from SKCL on Howard Langford; and the black ledger containing patient information constitute patient records. Such records could well indicate whether the controlled substances dispensed or prescribed by Dr. McCarthy were dispensed and/or prescribed for legitimate medical purposes. The twenty (20) receipts from Kalt Drugs constitute purchase records. Such records could be used to indicate that Dr. McCarthy was purchasing excessive amounts of controlled substances. In other words, there is a logical nexus between said records and the criminal activities in which Dr. McCarthy allegedly engaged.

■ Further, there is a logical nexus between Dr. McCarthy's financial status and his alleged violation. Those engaged in the illicit sale of controlled substances quite often possess large sums of money. Therefore, this Court concludes that the deposit ticket, dated September 7, 1984, in the amount of $1,603; the delinquent lease notice from Xyomed, Inc. dated April 15, 1982; the manilla envelope containing 1984 quarterly tax forms; and the file containing 1984 tax forms and receipts were not outside the scope of the search warrant.

However, at this time the Court lacks the information necessary to determine whether any logical nexus exists between the maroon vinyl "tell-address" book; the brown vinyl telephone/address book; the letter from MBNA to McCarthy; the seven Ohio Department of Public Welfare reimbursement assistance forms; the letter from Nationwide Insurance; the four discount coupons worth $2 each for Tennate Dospan; the receipt for insurance mail, V–086796931; the explanation of Medicare benefits (Charles Sizemore); the bill of lading C449229 from O'Neal, Jones & Feldman, Inc.; the letter from McNeil Pharmaceutical; the telephone book from the top of the desk; the unidentified letter; the steno pad and the criminal activities which allegedly took place. Accordingly, if the Government still wishes to utilize these items, the Government is given thirty (30) days from receipt of this Decision within which to file a properly documented brief indicating in general terms whether a logical nexus exists between *each* of the items listed in this paragraph and the criminal behavior alleged. Dr. McCarthy is given thirty (30) days from receipt of any such brief to file a properly documented brief in response to the Government's brief. The discussion contained in the Government's brief and that of Dr. McCarthy shall be *limited* in scope to *only* those items listed in this paragraph.

■ Even assuming *arguendo* that any or even all of the items noted in the preceding paragraph must ultimately be excluded, this Court cannot conclude that in seizing said items the DEA showed a flagrant disregard for the limitations of the warrant, and thus the Court concludes that the suppression of the contemporaneously seized items which were within the scope of the warrant is not required. *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir.), *cert.*

*denied,* 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed.2d 577 (1985).

■ Dr. McCarthy also objects to the fact that those executing the search of the premises of 1328 North Main Street "handle[d] every piece of paper therein, and remove[d] the patient charts of 1,522 patients when he made absolutely no effort to determine the status of the health of 1,517+ of the patients and had absolutely no idea of whether or not the individuals were receiving drugs for ethical, medical purposes...." (Doc. #43, at 4). The Court first notes that if the "seizure" to which Dr. McCarthy is referring is the pulling of documents at Dr. McCarthy's office in order to determine the content of said documents, those persons executing the search had a perfect right to pull said documents. The Government had a search warrant which allowed it to seize certain documents, and the only way to determine whether a particular document fell within the scope of said search warrant was to read that document.

If the "seizure" to which Dr. McCarthy is objecting is the removal of various patient files from Dr. McCarthy's office, the Court still cannot conclude that the removal of said documents exceeded the scope of the search. First, the Court notes that those who were examining the documents were not trained physicians. Undoubtedly many of the patients files seized had to be removed to DEA offices for expert analysis as to whether the controlled substances prescribed therein were properly prescribed. Further, the very nature of the violation alleged mandated that virtually all records referring to the prescription of controlled substances be seized. To judge Dr. McCarthy's practice of prescribing controlled substances based upon a small sample of his patient files would be unjust to Dr. McCarthy. The larger the sample the better the chance of establishing culpability. Further, as a practical matter, it would be impossible to select a representative sample. For example, randomly seizing one out of every five files containing a prescription for a controlled substance would not necessarily create a clear picture of Dr. McCarthy's procedures. Nor, in all fairness, could those conducting the search seize only those files which made Dr. McCarthy look particularly bad. In addition, the fact remains that if Dr. McCarthy prescribed controlled substances to only one patient without a legitimate, medical purpose, Dr. McCarthy would be in violation of the law. Finally, the Court notes that the DEA's only alternative to removing Dr. McCarthy's patient files was remaining in Dr. McCarthy's office for however many days, weeks, or months, it took to thoroughly analyze each file.

Based upon the foregoing, the Court concludes that the Government's seizure of patient files did not exceed the scope of the search warrant issued September 7, 1984.

### E. *The Reasonableness Of The Search*

The next issue before the Court is whether the officers executing the warrant acted so improperly that their conduct was constitutionally unreasonable. For the reasons set forth below, this Court concludes that the conduct of the officers executing the search was *not* constitutionally unreasonable.

■ This Court begins its analysis with the premise that as the officers executing the search possessed a valid search warrant, the Court must begin with the presumption that said search was constitutionally reasonable. *United States v. Penn,* 647 F.2d 876, 882 (9th Cir.), *cert. denied,* 449 U.S. 903, 101 S.Ct. 276, 66 L.Ed.2d 134 (1980). However, the Court agrees with the holding of the Ninth Circuit that "[s]uch initial 'reasonableness' can be vitiated ... by the manner in which the police conducted the search, even if the conduct did not rise to the shocking level of a due process violation." *Id.* The Court finds support for this proposition in the Sixth Circuit's recent holding that the means used to effectuate the seizure of a person (i.e. arrest) must be reasonable. *Blaska v. Fuentes,* 836 F.2d 1347 (6th Cir. Jan. 6, 1988) (text in WESTLAW). "There is no formula for testing the reasonableness of the searching and seizing officers. 'Each case is to be decided on its own facts and

circumstances.'" *United States v. Averitt,* 477 F.2d 1009, 1012 (6th Cir.1973) (*quoting United States v. Costner,* 153 F.2d 23, 26 (6th Cir.1946)). Reasonableness can be "determined by balancing the extent of the intrusion against the need for it." *Dugan v. Brooks,* 818 F.2d 513, 516 (6th Cir.1987). Thus, this Court must consider whether the manner in which the officers conducted the search of 1328 North Main Street was overly intrusive considering all of the facts and circumstances confronting said officers.

 The account of the events of September 7, 1984, provided by Dr. McCarthy and his witnesses and the account provided by the DEA and its witnesses are as different as night and day. Both sides present ample evidence in support of their claims. Thus, this Court is faced with a question of credibility. After reviewing the testimony of all witnesses, this Court concludes that the testimony of the Government's witnesses was simply more credible than that of Dr. McCarthy's witnesses, and as a result, concludes that the Court should accept the Government's account of the events of September 7, 1984.

In considering the credibility of the Government's witnesses and those of Dr. McCarthy, the Court took the following into account. The witnesses presented by Dr. McCarthy who testified as to the events of September 7, 1984, included: Dr. McCarthy (Transcript, at 308); his employee, Vickie Lee (Transcript, at 95); and his patients (Transcript, at 16, 46, 74, 86, 108, 118, 162, 296). Clearly, Dr. McCarthy and his bookkeeper/secretary, Vickie Lee, had a vested interest in the outcome of this hearing. The potential for criminal charges and/or loss of employment looms large. Further, this Court concludes that Dr. McCarthy's patients also had a vested interest in the outcome of this case. Virtually all of those who testified were long-time patients of Dr. McCarthy (Transcript, at 16, 46, 75, 87, 108, 118, 296). These

patients obviously did not wish to lose the services provided by Dr. McCarthy.[7] The Court *cannot* conclude that the Government's witnesses had any vested interest in the outcome of this hearing. Further, the perception of Dr. McCarthy's patients of the events taking place September 7, 1984, was no doubt clouded by the heat, surprise, and confusion of the moment. These were persons who were calmly awaiting a doctor's appointment when suddenly, their doctor's office was secured by Government agents. At the time that said agents entered the rear of the doctor's offices, those patients in the waiting room had no way of knowing that they were in fact Government agents. All they knew at that point was that some unknown persons were taking control of their doctor's office. In addition, Dr. McCarthy's patients were also subjected to a brief detention. All in all, the atmosphere in Dr. McCarthy's office on September 7, 1984, was hardly conducive to calm, rational thought. The Government's witnesses had the advantage of *knowing* exactly what was taking place. They were not shocked or surprised. Their perceptions were less likely to be clouded by the confusion and commotion.

Based upon all of the evidence in the record, the Court concludes that the following events took place on September 7, 1984.

On September 7, 1984, United States Magistrate Robert A. Steinberg issued a Search Warrant for the premises at 1328 North Main Street, Dayton, Ohio, upon the written affidavit of Gerald R. Kopp, Investigator, DEA, United States Department of Justice. At approximately 11 a.m. on said date, DEA Special Agent Anthony Placido and Dayton Police Officer Michael Perkins entered the premises at 1328 North Main Street, Dayton, Ohio, the medical office of Dr. Thomas H. McCarthy (Transcript, at 376, 412, 446). Agent Placido and Officer Perkins took seats in the waiting room at either side of the door which led to the

---

7. The Court notes that two of Dr. McCarthy's patients, Robert Taylor and Barbara Taylor, who testified to matters other than the events of September 7, 1984, drive approximately 360 miles from southeast Tennessee each month in order to visit Dr. McCarthy's office (Transcript, at 141–150). Dr. McCarthy's patients must feel that he can or will provide something that other doctors cannot or will not provide.

examining rooms (Transcript, at 77, 88, 376). Approximately three to four minutes later, when the door to the examining rooms at the rear of the office was opened from the inside, Agent Placido and Officer Perkins stepped through the door (Transcript, at 376, 413). Agent Placido and Officer Perkins did not shove anyone aside as they entered through the door, nor was anyone crushed behind the door (Transcript, at 415–416). Officer Perkins identified himself as a police officer both orally and by displaying his credentials and stated that they had a search warrant for the premises (Transcript, at 377, 413). At the time that Agent Placido and Officer Perkins stepped through the door from the waiting room, Agent Placido had a .357 Magnum revolver drawn (Transcript, at 379).

Agent Placido continued down the hall and located Dr. McCarthy in an examining room and advised him that the agents had a search warrant (Transcript, at 377). Agent Placido frisked Dr. McCarthy for weapons and requested that Officer Perkins radio to other officers awaiting outside the building that everything was secured (Transcript, at 377). Officer Perkins' radio call was received by the officers waiting outside at approximately 11:04 or 11:05 a.m. (Transcript, at 415, 447).

Agent Placido did not scream "Where's the M.F. [sic] at?" while he was searching for Dr. McCarthy (Transcript, at 379, 418). Nor did he refer to McCarthy as an S.O.B. [sic] (Transcript, at 379, 418).

Agent Placido did place Dr. McCarthy against a wall in order to conduct a search of his person (Transcript, at 379–80). However, Officer Perkins did not come up behind Dr. McCarthy, while Agent Placido was searching Dr. McCarthy, and kick Dr.

McCarthy's legs out from under him (Transcript, at 380, 418). Further, Agent Placido *never* pointed a firearm at Dr. McCarthy (Transcript, at 383). During this search, Agent Placido discovered two hard bulges in Dr. McCarthy's front pockets (Transcript, at 377).

Agent Placido then informed Dr. McCarthy that Dr. McCarthy was *not* under arrest (Transcript, at 377). DEA supervisory investigator, Patricia A. Good, who entered the office about five minutes after Agent Placido and Officer Perkins, heard Agent Placido inform Dr. McCarthy that he was not under arrest (Transcript, at 398, 399). Agent Placido did read Dr. McCarthy his rights (Transcript, at 377, 448). Dr. McCarthy declined to make a statement (Transcript, at 448).

At approximately 11:04 or 11:05 a.m., Agent Kopp entered the building and proceeded to the examining room in which Agent Placido and Dr. McCarthy were located (Transcript, at 447). Agent Kopp witnessed Dr. McCarthy's pockets being emptied of a large quantity of tablets (Transcript, at 377, 448). Agent Kopp advised Agent Placido that said tablets were in fact a Schedule III controlled substance (Transcript, at 378). Agent Placido gave Dr. McCarthy a copy of the search warrant and advised him to keep said copy for his records (Transcript, at 449). He further advised Dr. McCarthy that Dr. McCarthy might want to contact his attorney (Transcript, at 449). Agent Placido informed Dr. McCarthy that Dr. McCarthy was in fact free to make a phone call at this point (Transcript, at 378, 399–400). Dr. McCarthy did in fact make one or more phone calls including one to his attorney, Konrad Kuczak (Transcript, at 378, 400, 419).[8]

---

8. In an Affidavit dated November 6, 1984, Konrad Kuczak testified "that at approximately 11:10 A.M. on September 7, 1984, he received a telephone call from Dr. Thomas McCarthy indicating that there were Medical Board Agents, City Police, and Federal DEA Agents in his office moving the place out wholesale and that he was under arrest." (Doc. # 11, Appendix L–1, Affidavit of Konrad Kuczak). Subsequently, Mr. Kuczak testified that "I was unaware of the origin of the telephone call when I filed a previous affidavit with this Court." (Transcript, at 473). Mr. Kuczak stated that "my office received a telephone call advising my office on September 7, 1984, that a raid was in progress at Dr. McCarthy's office, but I was not available to answer the telephone call, and I have no idea who placed the call but I believe the call originated at Kalt's Pharmacy from information which I learned subsequent to 1985...." (Transcript, at 473).

Dr. McCarthy was informed that while he was free to leave the premises, the DEA would prefer that he remain and witness the warrant (Transcript, at 378). After speaking briefly on the telephone, Dr. McCarthy walked to the waiting room and sat down (Transcript, at 378).

Approximately 30 minutes after Agent Placido's original entry, Agent Placido received a telephone call from Attorney Konrad Kuczak (Transcript, at 381–82). Agent Placido informed Mr. Kuczak that the search warrant was drawn upon 1328 North Main Street and not upon Dr. McCarthy (Transcript, at 382). Mr. Kuczak arrived at the premises at some time between 12 p.m. and 1 p.m. (Transcript, at 382; Doc. # 1, Affidavit of Konrad Kuczak). Mr. Kuczak carried a camera and was attempting to move about the office to take photographs (Transcript, at 382, 400, 425). Despite repeated warnings to stay out of the search area, Mr. Kuczak made three separate attempts to enter the office/examining room area (Transcript, at 383, 401, 426). On the third such attempt, Mr. Kuczak was grasped by the arms and carried back to the waiting room (Transcript, at 383, 401).

After Dr. McCarthy was initially located, Officer Perkins went back to the waiting room to identify the persons who were sitting there to determine if anyone was a wanted person and to identify possible future witnesses (Transcript, at 414, 416, 451). Once the records were checked, those persons who were not wanted were released (Transcript, at 415). Three persons were arrested: two were on the capias list and, one, Major Hill, was arrested for possession of drugs (Transcript, at 417). A marijuana cigarette was also discovered on Major Hill (Transcript, at 417).

With regard to the actual search, DEA Supervisory Investigator Good took photographs of the premises to verify the condition of the office at the time the agents arrived (Transcript, at 398). Those involved in the search "were looking for patient records regarding the distribution or prescription of controlled substances and related appointment books and insurance claims for the same purposes." (Transcript, at 398–99). Supervisory Investigator Good, Agent Kopp, Craig Morgan of the Medicaid–Medicare Fraud Unit, and Detective Bob Chabali of the Dayton Police Department were responsible for reading the files (Transcript, at 449–50). Agent Kopp was responsible for deciding which items were to be seized (Transcript, at 450). Mr. Young from the State Medical Board was also present (Transcript, at 452–53). However, Mr. Young was not authorized to remove any records from the premises and was not observed leaving with any records (Transcript, at 453). Mr. Young assisted by questioning the patients as to their identities and by pulling patient files for those who were assigned to read said files (Transcript, 404–05). Agent Placido maintained security and assisted in making out the inventory of items seized (Transcript, at 384).

During the afternoon, Dr. McCarthy sat in the waiting room with Mrs. McCarthy (Transcript, at 420). The search was completed sometime between 3:30 p.m. and 4 p.m. (Transcript, at 384).

Based upon the foregoing facts, this Court cannot conclude that the search conducted by the Government was constitutionally unreasonable. The Court first notes that as with the vast majority of searches, the element of surprise was essential to this search. Agent Placido and Officer Perkins could *not* allow the occupants of the premises the opportunity to hide, alter, or destroy records. This Court concludes that the method of entry selected by Agent Placido and Officer Perkins was quite reasonable. It allowed the Government to surprise the occupants of the building, while protecting those innocent bystanders located in the waiting room from the potential for violence. The Government's plan allowed any adverse reaction to the search to manifest itself at the *rear* of the building, away from the majority of patients.

The Court further recognizes that it is vital that Government agents executing a search first secure the scene. Control is essential to protecting the items to be searched, the safety of bystanders, and the safety of the Government agents themselves. The Government agents were walking into the "den" of a suspected drug

dealer. It was not unreasonable for Agent Placido to keep his weapon drawn until he was certain that the safety of the bystanders and the agents was assured. Further, it was most certainly not unreasonable to prevent those inside the building from leaving for a brief period and those outside the building from entering. Once again, a key consideration is maintaining the status quo of the items to be searched and insuring the safety of those within the building.

This Court has concluded that Howard Langford was not pushed to the ground by Agent Placido or Officer Perkins as they walked through the doorway to the rear of the offices. However, even assuming, *arguendo*, that such an incident did occur, this Court cannot conclude that said incident was sufficient to make the search constitutionally unreasonable. As previously noted, it was essential that once the occupants of the premises had any idea that "something was up", the building be secured as quickly as possible. If Mr. Langford was indeed brushed aside, it was certainly not done with any malicious intent. It is also asserted that Mary McCarthy was crushed behind the door. Once again, this Court does not conclude that said incident occurred, but even assuming that it did, said incident cannot be termed constitutionally unreasonable. Once again, the Court notes that the officers had to move quickly.

Further, this Court cannot conclude that Dr. McCarthy was in any way denied access to counsel. However, even assuming *arguendo*, that Dr. McCarthy was denied access to counsel, this Court cannot conceive of how such a denial could constitute the proximate cause of a constitutional deprivation. Counsel is simply not required to be present at a search. In addition, even if counsel is present at a search, counsel may not interfere with said search. Which brings the Court to its next point, the fact that Mr. Kuczak had no right to enter the area which was being searched. The Government's act of denying Mr. Kuczak access to the search area, in no way denied Mr. Kuczak access to his client or to the warrant. This Court concludes that Agent Placido gave Mr. Kuczak ample verbal warning to remove himself from the search

area and was not acting unreasonably in physically removing him from said area.

After considering all of the facts and circumstances surrounding the search, this Court concludes that the Government did not intrude any more than was absolutely necessary. Based upon the foregoing, this Court concludes that the search of September 7, 1984, was *not* constitutionally unreasonable.

### F. *The Issue Of Damages*

 The final issue before the Court is whether Dr. McCarthy is entitled to damages for the Government's failure to comply with this Court's Order to promptly return his documents. Dr. McCarthy seeks damages in the amount of $750 per day as of September 7, 1984 (Doc. # 5). For the reasons briefly set forth below, the Court concludes that Dr. McCarthy is not entitled to any award of damages.

The Court first notes that Dr. McCarthy has failed to establish that the Government failed to comply with Magistrate Steinberg's Amended Order. By September 17, 1984, the DEA had provided Dr. McCarthy with copies of all documents seized during the search of September 7, 1984. (Doc. # 9, Affidavit of Gerald R. Kopp, at 4). At the time that said copies were returned to Dr. McCarthy's office, Vickie Walls and an assistant compared the inventory form attached to each box of files with the files actually contained in said box (Transcript, at 454–55). The DEA received no complaints from anyone associated with Dr. McCarthy as to the quality of the copies that had been provided by the DEA (Transcript, at 455). The Court concludes that, while the individual records located in the boxes which were delivered to Dr. McCarthy were not necessarily placed in said boxes in any particular order, the integrity of each individual record was maintained (Transcript, at 402, 453). Dr. McCarthy asserts that reorganizing his files required at least 90 hours (Doc. # 8, Affidavit of Thomas H. McCarthy, D.O.). This Court simply cannot conceive of how the filing of approximately 1500 files would require 90 work hours.

The Court next notes that this was a *lawful* search. As previously discussed,

the DEA had a right to the files that it seized. This Court was able to find absolutely no precedent for awarding damages based upon a legal seizure. Further, a number of courts have held that even when seized property has been destroyed, Rule 41(e) simply does not support a claim for money damages. *See United States v. Totaro,* 472 F.Supp. 726, 729–30 (D.Md.1979); *Mayo v. United States,* 425 F.Supp. 119, 122–23 (D.Ill.1977).

Based upon the foregoing, this Court concludes that Dr. McCarthy is *not* entitled to damages based upon the Government's lawful seizure of his property.[9]

## II. CONCLUSION

In sum, this Court has made the following determinations:

(1) Though there were reckless omissions in the Affidavit in support of the warrant of September 7, 1984, the Affidavit's remaining content *was* sufficient to establish probable cause;

(2) The information provided in the Affidavit in support of the warrant of September 7, 1984, was not stale, and thus was sufficient to establish probable cause;

(3) There was probable cause to support a search of the breadth authorized by the warrant of September 7, 1984;

(4) The officers executing the warrant did not seize items from Dr. McCarthy's premises which were outside the scope of the warrant;

(5) The officers executing the warrant did not act so improperly that their conduct was constitutionally unreasonable;

(6) Dr. McCarthy is not entitled to damages for the Government did not fail to comply with this Court's Order to promptly return his documents and the search executed by the Government was lawful.

Approximately five days after the conclusion of the evidentiary hearing on this matter, Dr. McCarthy's counsel, Mr. Kuczak, sent this Court a letter indicating that Dr. and Mrs. McCarthy "are of the firm opinion that the individual, who identified himself as Agent Tony Placido under oath in your [this] Court on November 12, 1986, was not the same individual who identified himself as such on September 7, 1984." Both Dr. and Mrs. McCarthy subsequently filed affidavits (Doc. # 37, 38) and amended affidavits (Doc. # 39, 40) in support of this allegation.

The Court has determined that the best course of action with regard to this matter is to grant Dr. McCarthy leave to file a Motion to Strike the testimony of Agent Tony Placido within thirty (30) days of the filing of this Entry and the Court hereby does so. If, after considering said motion and the Government's reply thereto as well as any and all properly documented evidence submitted by either party, the Court concludes that the "real" Agent Placido did not testify, the Court will reconsider its Decision with regard to Dr. McCarthy's Motion for the Return of Property.

---

9. The DEA has already expended countless manhours and $3500 in copy machine rental fees in an effort to restore Dr. McCarthy's files as quickly as possible. (Transcript, at 453–54).